IRVING, J.,
 

 for the Court.
 

 ¶ 1. William Harris filed a breach of contract lawsuit against his former employer, Tom Griffith Water Well and Conductor Service, Inc. (Griffith Water Well, alternatively, Griffith). A trial was held, and the Marion County Chancery Court dismissed the complaint and entered a judgment in favor of Griffith. Aggrieved, Harris appeals and asserts: (1) that the chancellor’s findings were against the overwhelming weight of the evidence, (2) that the chancellor erred in considering the affirmative defenses of statute of limitations and laches in reaching his decision, and (3) that the chancellor erred in finding that Harris and Griffith did not have an enforceable contract.
 

 ¶ 2. Finding error, we reverse and render and remand for further proceedings consistent with this opinion.
 

 FACTS
 

 ¶ 3. In 1978, Griffith started Griffith Water Well. He later started an environmental drilling company that operates out of the same office as Griffith Water Well. Andy Rushing worked as a salesman for Griffith’s environmental drilling company, and he and Griffith entered into an agreement whereby Rushing received a commission for sales that he brought into the company. In 1992, Griffith’s long-time friend, Harris, began working at Griffith Water Well on a part-time basis. Initially, Harris performed office work for Griffith, but around 1993 or 1994, Harris expressed an interest in becoming a salesman for Griffith Water Well. Thereafter, he and Griffith entered into a verbal agreement whereby Griffith agreed to pay Harris a ten percent commission on all of the gross sales that Harris brought into the company. Harris left the company in May 2002, after Griffith informed him that he could no longer afford to keep him on.
 

 ¶4. Harris filed suit on July 11, 2002, seeking to recover: (1) “[a] full and complete accounting of all sales generated by [him] on behalf of [Griffith] from and after January 1, 1994, through December 31, 2002,” (2) “[compensation in an amount sufficient to satisfy the terms of the agreement of compensation between the parties in an amount no less than One Hundred Fourteen Thousand Six Hundred Eighty Four Dollars and 99/100 ($114,684.99),” (3) “[a]n equitable lien to be placed on all property owned by [Griffith] for the benefit of the Plaintiff until such time as all sums due have been paid in full,” and (4) “[p]re-[judgment] and post[-]judgment interest, attorney’s fees, and all costs of court.”
 
 [1]
 
 Although Harris alleges that Griffith owes him money for sales that he made pursuant to their commission agreement, Griffith contends that he terminated the commission agreement in either 1995 or 1996. The case went to trial on February 15, 2007.
 

 
 *354
 
 ¶ 5. Harris testified that he went to work for Griffith Water Well in December 1992 on a part-time basis before becoming a full-time employee in January 1993. Harris stated that he initially performed office duties and began making sales for Griffith Water Well toward the end of 1993. Harris was not certain whether he approached Griffith in December 1993 or January 1994 about the two of them entering into an agreement whereby Harris would continue to perform office work for Griffith Water Well and also would take on the added duties of a commissioned salesman, receiving a ten-percent commission on all gross sales that he brought into the company. Harris testified that Griffith accepted his offer and that the agreement began at that time. Harris also stated that under this agreement, he would be paid as an independent contractor, per Griffith’s suggestion.
 

 ¶ 6. According to Harris, after he generated sales, he would present an invoice to Griffith, who would issue him two checks each week: one for the administrative work that he performed as an employee, wherein taxes were taken out, and one for money that he earned as an independent contractor pursuant to their commission agreement. No taxes were withheld from the commissions paid to Harris. Harris stated that Griffith paid him sporadically in the beginning but eventually got to a point where he paid him every week. Harris recalled that Griffith never paid an entire invoice at one time, but rather, Griffith “paid on the account weekly over a long period of time, and as the total amount of money that he had paid in equaled what was owed on an invoice, [that invoice] was retired, and so he was always paying on his account.” Harris explained that Griffith’s financial problems prevented him from being able to pay an entire invoice at a time. Harris stated that it was common for Griffith to get behind on payments, so he would inform him, verbally, approximately twice a year* that the debt was accumulating. Harris stated that, in an effort to catch up, Griffith would frequently issue him large checks, but that Griffith would later fall back into the same routine. Further, Harris was clear that Griffith never caught up completely. Harris issued his last invoice to Griffith on December
 
 31, 2001.
 

 ¶ 7. Harris testified that in May 2002, Griffith informed him that he could not afford to continue paying him pursuant the terms of their commission agreement. However, Harris was adamant that prior to this time, he and Griffith had not engaged in any discussion with respect to changing the terms of compensation to provide for compensation on a fixed weekly-salary basis rather than the percentage-of-gross-sales-commission basis to which they had initially agreed. Harris further testified that he then asked Griffith about the money that Griffith owed him and that Griffith informed him that he did not plan to pay him.
 

 ¶ 8. On cross-examination, Harris denied being party to a conversation with Griffith wherein Griffith asked him to accept payment of $1,000 per week in lieu of the ten percent commission on gross sales that he had been receiving. Harris also stated that he continued to issue invoices to Griffith because Griffith never told him to stop doing so. Harris admitted that he never gave Griffith anything in writing to let Griffith know that Griffith was behind in his payments; however, Harris contended that Griffith was aware that he was behind because Harris would inform him of such from time to time. Griffith’s attorney pointed out that Harris did not have any record from Griffith indicating that Griffith owed Harris any back commissions.
 

 
 *355
 
 ¶ 9. Harry Kenneth Lefoldt Jr., a certified public accountant hired by Harris, testified as an expert and concluded that Griffith owes Harris $144,638.07, plus prejudgment interest of $56,597 though February 15, 2007, the date of trial.
 
 [2]
 
 Lefoldt further testified that he took the sum of the payments that Griffith had made and subtracted them from the sum of invoices from two categories: (1) invoices submitted to Griffith from 1995 to 2001, and (2) invoices for commissions earned but not submitted in the amount of $11,142.13.
 
 [3]
 
 Lefoldt testified that he used a “first in/ first out” methodology to arrive at the balance. He explained that the first in/ first out methodology is a method whereby payments that are received are applied against the earliest invoices first.
 

 ¶ 10. Griffith testified in his defense. He stated that he and Rushing entered into an agreement whereby Rushing would receive a ten percent commission on gross sales that he brought into the company. Thereafter, Harris, who was not working for him when he made the agreement with Rushing, asked him if he they could enter into the same agreement. Griffith agreed, and the two of them entered into the same agreement that Griffith had with Rushing. Griffith testified that, in either 1995 or 1996, he informed Harris and Rushing that from that point forward he would pay each of them a “set amount” of $1,000 a week. Griffith stated that at the time that they reached this new agreement, he was behind in payments to both Harris and Rushing. However, he stated that he paid Harris back in full over the following two years.
 

 ¶ 11. Griffith recalled an incident when Harris attempted to give him an invoice after he had informed Harris that he could no longer pay him the ten percent commission. Griffith stated that he told Harris not to give him the invoice after explaining to Harris that they were no longer “on this.” According to Griffith, Harris responded by saying, “Well, I just want to keep score. I want to keep up with it.” Griffith stated that he then told Harris, “okay, but we’re not on it.” Griffith stated that Harris continued to work for him and never mentioned that he felt as though Griffith owed him money pursuant to the commission agreement.
 

 ¶ 12. Griffith stated that he learned for the first time at the hearing that Harris did not consider his payroll check to be a part of his sales commission. Griffith also stated that he did not know that Harris was under the impression that he owed him money until he received notice of the lawsuit. Griffith stated that in early 2002 he informed Harris that he could no longer
 
 *356
 
 afford to pay him. Griffith stated that it was at this point that Harris left his employment.
 

 ¶ 13. On cross-examination, Harris’s attorney pointed out that even though Griffith testified that he paid Harris all of the money that he owed him pursuant to the commission agreement, Griffith does not have documentation to reflect this. Harris’s attorney asked Griffith how he knew when the money that he owed pursuant to the ten percent commission agreement had been paid in full. Griffith responded by saying that Harris “kept up with it” and that he kept paying until Harris told him that it was paid in full. Harris’s attorney pressed Griffith to explain how he could say with certainty that he paid Harris in full when there is no documentation to support his assertion. Griffith responded by stating that the ledgers and invoices were created by Harris. Harris’s attorney then posed the following question to Griffith, “[y]our testimony is that you were relying on him, were you not?” Griffith responded by saying that he relied on Harris until Harris began saying that he owed him money. Griffith vehemently denied that Harris ever told him that he owed Harris money pursuant to the commission agreement.
 

 ¶ 14. Harris’s attorney pointed out that Griffith’s trial testimony differed from his deposition testimony on this issue. During his deposition, when asked whether he had paid Harris all of the money relating to the commission agreement, Griffith stated that: “Up until some point in time, to the best of my knowledge, I paid him. I do not know for certain, but I’m almost sure. I feel like I did, but I may not have.” When confronted with his response from the deposition, Griffith stated, “I don’t know why I said that then, but I did pay him all of it.” Griffith also stated that although he agreed to pay Harris a fixed amount of $1,000 a week, there were some weeks that he simply could not afford to do so. Thus, the payments that Harris received fluctuated, and on some weeks, Harris received well below $1,000.
 

 ¶ 15. On redirect, Griffith stated that Harris and Rushing continued to work for him when he became unable to continue with the commission agreement and that they agreed upon a one thousand dollar per week salary. Griffith stated that when he realized that it would be impossible for him to make full payment to Harris and Rushing for a particular week, he would let them know and that he would eventually pay them for that week.
 

 ¶ 16. Bethany Lee, Griffith’s bookkeeper, testified at the trial and stated that at some point in time Griffith began to pay Harris a certain amount each week. Lee stated that Harris never informed her that Griffith owed him any money and that there is no record of Griffith owing Harris money. Lee testified that she had never seen any invoices from Harris.
 

 ¶ 17. On cross-examination, Lee stated that Harris received two checks, a payroll check and a sales check. Lee stated that she knew that Harris and Rushing were receiving commissions on sales that they brought in but that she was not aware of the details of the agreement. Harris’s attorney asked Lee, “[d]id the commission checks continue, the sales expense commission checks continue from the time that you got there all the way up till 2002, when you left?” Lee answered in the affirmative. Nevertheless, on redirect, Lee stated that she recalled that Harris and Rushing began receiving a fixed amount each week, but she could not remember when that had occurred. Specifically, Lee testified that, at some point, Griffith informed her that he would begin paying Harris and Rushing a certain amount each week. According to Lee, from that point forward,
 
 *357
 
 she issued Harris and Rushing checks for a certain amount each week.
 

 ¶ 18. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Weight of the Evidence
 

 ¶ 19. “This Court always reviews a chancellor’s findings of fact, but we do not disturb the factual findings of a chancellor unless such findings are manifestly wrong or clearly erroneous.”
 
 Vaughn v. Vaughn,
 
 798 So.2d 431, 433(¶ 9) (Miss.2001) (citing
 
 Bowers Window & Door Co., v. Dearman,
 
 549 So.2d 1309, 1312-13 (Miss.1989)). “Findings of the chancellor will not be disturbed or set aside on appeal unless the decision of the trial court is manifestly wrong and not supported by substantial credible evidence, or unless an erroneous legal standard was applied.”
 
 Id.
 
 at 433-34(119) (citing
 
 Pearson v. Pearson,
 
 761 So.2d 157, 162(¶ 14) (Miss.2000)).
 

 ¶ 20. Harris contends that several findings reached by the chancellor were against the overwhelming weight of the evidence. Harris argues that the chancellor’s finding that he was a “salaried employee,” and not an independent contractor, is not supported by the record.
 
 [4]
 
 As stated, both Harris and Griffith agree that, for the procurement of sales by Harris, Harris was considered to be, and paid as, an independent contractor. This arrangement continued until at least 1995 or 1996. Also, there is no dispute that until either 1995 or 1996, Harris was considered, and paid as, an employee for separate office, administrative work that he performed. Further, there is no dispute that pursuant to their sales agreement, Harris was to be paid ten percent of the gross sales that he brought into the company. However, what is in dispute is whether a novation of the agreement occurred that changed Harris’s status from an independent contractor to an employee, and whether Harris was paid all that was due him under the independent contractor sales agreement.
 

 ¶ 21. Harris argues that he continued to be an independent contractor and worked pursuant to the commission agreement from the time they entered into the agreement until he left Griffith Water Well in 2002. On the other hand, Griffith argues that the agreement was changed in either 1995 or 1996 because he was unable to keep up his end of their agreement. It should be noted here that Griffith did not specifically testify that Harris agreed to the change. Rather, he testified that he told Harris that that was what he was going to do and that that is what he did. He further testified that Harris continued to work for him thereafter. Therefore, accepting Griffith’s testimony as true, the most that can be said is that Harris acquiesced in the change.
 

 ¶ 22. Griffith testified as follows when questioned by his attorney regarding when the commission agreement ended:
 

 Q. Mr.- Griffith, you paid Mr. Harris 10 percent of his commissions for a time period. When did that stop and what happened to cause that to stop?
 

 A. I don’t know exactly when that happened, but it was somewhere around 1995, give or take, maybe
 
 *358
 
 '96.1 don’t believe it was before '95. But that’s when I just — during that time period, somewhere in there, I told Bill and Andy, I said, [tjhings are getting out of whack on this 10 percent agreement, we’ve got. I said, [w]e need to go to a set amount, and I said that — we were approaching 1.4 million in sales, somewhere in that area, and as I said a while ago, I wanted to keep it kind of balanced between the house and the two salesmen. I said, I want to just pay y’all $1,000 a month.
 

 Q. $1,000 a month?
 

 A. Per month. Each one $1,000. Bill $1,000 and Andy $1,000.
 

 Q. Per month or per week?
 

 A. I mean per week. Yeah, per week, which was $52,000 a year. I told them that’s how much I wanted to pay, and I said, [tjhat’s what I want to do, and that’s what we did. And just to real quickly kind of clear up about something that was going on while we’re talking about that amount, the $750 sales that Bill was getting was the amount he wanted to draw through his sales company, Harris & Associates. Then the other $300 he wanted to draw as salary. And the way I recall it, it had nothing to do with him working in the office. That was his total sales commission. That’s how it gets to $1,000, the $300 plus $750. I don’t remember why it was $50. But I also have some notes here concerning Andy Rushing and what I was paying the companion salesmen on the other side, and I was trying to keep them relatively level in salaries because they were doing relatively level work.
 

 ¶23. It is noteworthy that Griffith’s response to a pretrial interrogatory was markedly different from his trial testimony. During discovery, he was asked the following interrogatory: “Please state the nature of your relationship with the Plaintiff, including the specific dollar amounts or percentages that were intended as compensation under the arrangement, and describe the services to be performed by the Plaintiff in return for such compensation.” Griffith’s response was:
 

 I started my business as Tom Griffith Water Well & Plumbing Service in 1978. In 1980 I started Tom Griffith Water Well & Conductor Service, Inc. In 1992 Mr. Harris (later referred to as Bill) came to work as an independent contractor for me. When Bill came to work for me our verbal agreement was that he would make 10% off the gross sales that [he] generated. Andy Rushing was under the same agreement with regard to environmental sales. At the time this agreement was made it was not made in writing because we had no way to know where this was all going or any history to review how an agreement would work. The final part of our verbal agreement was we will see how this goes. Later it became apparent that this agreement would not work because there was no way to determine which sales he generated. There were numerous mergers, acquisitions, and customer employment changes, etc. which made it impossible to determine who generated [the] sales. Therefore,
 
 I started paying him $750.00, a week.
 
 This continued for three or four years. I later terminated him after September 11 when we lost over 1/3 of [the] total sales. I could not afford the overhead of my staff at that time. I no longer had the money to pay him any money. Bill worked under the arrangement for $750.00, for years be
 
 *359
 
 fore he left. Bill was not my employee. He was a private contractor.
 

 (Emphasis added). Griffith never mentioned anything at trial about an agreement whereby he agreed to pay Harris seven hundred and fifty dollars per week. As evidenced by the colloquy above, Griffith testified that when he could no longer afford to pay Hands pursuant to their commission agreement, he agreed to pay Harris $1,000 per week, not seven hundred and fifty dollars per week.
 

 ¶ 24. In his judgment, the chancellor stated that “[sjometime prior to 1999 Griffith changed Harrises] employment status and began paying him $1,000 each week ... with Griffith testifying that the change was necessary as a result of a downturn in gross income and sales for the company, and that he thought $1,000 weekly was a good income for Harris.” The chancellor went on to find that “there was essentially a contract of employment at will between the parties, initially based on Harris receiving a commission, as reflected by Griffith’s payment method, and then changed to a weekly salary, as based on Griffith’s payment method between 1999 and 2002.”
 

 ¶ 25. The chancellor’s finding that the agreement changed prior to 1999 is consistent with Griffith’s testimony; however, it should be noted that Griffith testified that he changed the terms of payment to a fixed amount in either 1995 or 1996. Therefore, the chancellor’s finding that the payment method changed “between 1999 and 2002” is inconsistent with Griffith’s testimony. The documentary evidence from Griffith covered the period of time from January 7, 1997, until May 15, 2002. This documentation shows that payments to Harris fluctuated during this entire period of time. It is impossible to discern from this documentation what type of payment arrangement was being employed. More importantly, it is impossible to determine that Harris was paid a salary of $1,000 per week.
 

 ¶ 26. Griffith’s testimony was that the one-thousand-dollar payment was divided between the two checks that Harris received each week. We note that, at times, the two checks that Harris received for a particular week totaled more than $1,000 and at other times fell far below $1,000. For example, in September 1998, Harris received checks for $750 on the 4th, 11th, 18th, and 25th. These checks are coded as “sales expense” in Griffith’s records. Griffith’s records also reflect that on the 6th, 13th, 20th, and 27th, Harris received a check for $271.
 
 [5]
 
 Griffith testified that the $271 represented the net pay of a $300 payment made to Harris. Accepting Griffith’s testimony as true would result in a finding that Griffith paid Harris $1,050 for those weeks instead of $1,000, which according to Griffith, was the agreed weekly salary. Griffith could offer no explanation why the payments were fifty dollars more than the agreed upon amount. On the other hand, in February 2002, Harris received checks on the 3rd, 10th, 17th, and 24th. The checks received on the 3rd and the 10th were in the amount of $249.05 each, and the checks received on the 17th and the 24th were in the amount of $255.05. The checks received on the 6th, 13th, 20th, and 27th were in the amount of $200 each. As stated, Griffith could offer no explanation for the extra amount. In fact, Griffith testified that: “That was his [Harris’s] total sales commission. That’s
 
 *360
 
 how it gets to $1,000, the $300 plus $750. I don’t remember why it was $50.”
 

 ¶ 27. At oral argument, Griffith’s attorney was unable to bring any clarification to the muddled situation. For example, she stated to this Court that between June 19, 1998, and April 12,1999, Griffith paid Harris $750 and that between April 16, 1999, and November 1999, the payment was $500. She further stated that the payment went down to $250 after September 11, 2001. Griffith’s documentation corroborates his counsel’s statement at oral argument that after September 11, 2001, the payments went down to $250. There is no testimony, nor any assertion made during oral argument, that Harris and Griffith ever changed the terms of their agreement a second time to reflect that Griffith would pay Harris whatever he could afford to pay him at the time. Clearly, Griffith was not paying Harris according to the terms of the agreement that he testified that they entered into.
 

 ¶ 28. Based on our review of the record, we cannot find substantial evidence of a novation of the initial sales commission agreement. In this regard, we are mindful that Griffith testified that there was and that the chancellor, as the finder of fact, was entitled to accept Griffith’s assertion that there was a novation. However, it cannot be overlooked that Griffith could not state with any specificity as to when the novation occurred, nor could he produce any documentation that corroborated his testimony. Under these circumstances, we cannot say that there was substantial evidence that a novation in fact occurred. Therefore, we reverse and render the chancellor’s determination that Harris and Griffith entered into a novation of their agreement and thereafter entered into an agreement whereby Griffith would pay Harris a weekly payment of $1,000. The chancellor reached the conclusion that the agreement between Harris and Griffith had been changed based on his conclusion that the documentation bears that out, but as we have pointed out, neither the documentation nor the testimony in the record supports this conclusion. Therefore, we remand this case to the chancellor for the purpose of determining the amount owed to Harris pursuant to the commissioned-based contract that Griffith and Harris entered into.
 

 2. Statute of Limitations, Laches, and Course of Dealing
 

 ¶ 29. In his second issue, Harris offers several reasons as to why we should hold the trial court in error for relying on the statute of limitations, laches, and course of dealing in rendering its decision. First, Harris contends that Griffith waived his right to assert the aforementioned affirmative defenses, as Griffith asserted them for the first time in his motion for summary judgment which was filed on February 7, 2007, eight days before trial. Although Griffith filed a pleading that he entitled “Affirmative Defenses and Answer to First Amended Complaint, Motion to Compel, and a Motion to Dismiss” on February 13, 2006, he did not mention the statute of limitations, laches, or course of dealing in his motion. Rather, Griffith simply stated that he was answering the complaint “without waiving any of the available defenses.” Also, in his answer, Griffith stated that he had presented the court with affirmative defenses; however, none were specifically raised. The chancellor, on the first day of trial, overruled Griffith’s motion for summary judgment after concluding that a genuine issue of material fact existed. Nevertheless, in his judgment, the chancellor found that: “Griffith argues the statute of limitations and laches as defenses to Harris’s failure to make demand or otherwise memorialize
 
 *361
 
 amounts due him from much earlier commission invoices.”
 

 ¶ 30. Harris argues that the chancellor erred in considering affirmative defenses that were not raised in Griffith’s answer. Rule 8(c) of the Mississippi Rules of Civil Procedure provides that “[i]n pleading to a preceding pleading, a party
 
 shall set forth affirmatively ...
 
 laches ... statute of limitations ... and any other matter constituting an avoidance or affirmative defense.” (Emphasis added). Further, Rule 12(b) of the Mississippi Rules of Civil Procedure requires that “[e]very defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading....” As stated, Griffith did not assert any affirmative defenses in his answer to Harris’s complaint; rather, he waited and asserted them in his motion for summary judgment, which was over four years later. It is settled law in this state that when a responsive pleading is required, all affirmative defenses must be raised in that pleading.
 
 Miss. Dep’t of Human Servs. v. Guidry,
 
 830 So.2d 628, 634(¶ 20) (Miss.2002) (citing M.R.C.P. 12(b)). Therefore, we agree with Harris that the chancellor erred in relying on these affirmative defenses in reaching his judgment.
 

 ¶ 31. Second, Harris argues that even if we were to conclude that Griffith did not waive his right to assert the affirmative defenses, Griffith should be barred from doing so because Griffith’s assertion, some four and a half years after the initial complaint was filed, constitutes excessive delay. We decline to address this issue, as we have already concluded that Griffith waived his right to assert the affirmative defenses because he did not do so in his first responsive pleading as required by Rule 12.
 

 ¶ 32. Third, Harris argues that because the chancellor overruled Griffith’s motion for summary judgment wherein he asserted the statute of limitations, laches, and course of dealing, the chancellor indirectly found that the statute of limitations, lach-es, and course of dealing did not apply. The chancellor never ruled on Griffith’s motion for summary judgment, and we are not prepared to conclude that the chancellor indirectly found that the statute of limitations, laches, and course of dealing did not apply simply because he overruled Griffith’s motion. The most logical conclusion that can be drawn from the chancellor’s overruling of Griffith’s motion for summary judgment is that the chancellor found that a genuine issue of material fact existed.
 

 3. Enforceable Contract
 

 ¶ 33. In his final issue, Harris argues that the chancellor erred in finding that he and Griffith did not have an enforceable contract. We find that the chancellor did in fact find that Harris and Griffith entered into an enforceable contract. Thus, the chancellor did not make the finding that Harris contends he made. The chancellor found that the parties did not enter into a contract that required Griffith to pay a commission to Harris until Harris was terminated or left Griffith’s employment. Rather, the chancellor found that the parties initially entered into “a contract of employment at will based on Harris receiving a commission, as reflected by Griffith’s payment method” but that the contract was “changed to a weekly salary, ... based on Griffith’s payment method between 1999 and 2002.”
 

 ¶ 34. The wording utilized by the chancellor suggests that the chancellor determined the nature of the at-will contract by the method of payment employed by Griffith at any given time, that is, whether it
 
 *362
 
 was an at-will independent contractor contract or an at-will employee contract. This view of the nature of the contract does not comport with the undisputed facts in the record. Both Harris and Griffith agree that they entered into an oral contract that required Griffith to pay Harris a ten percent commission on all sales procured by Harris. Thus, the nature of the contract was determined by the agreement of the parties, not the manner of payment employed by one of the parties to the contract. Further, the record is clear that both Harris and Griffith agreed that during this commission arrangement, Harris was to be considered an independent contractor. The bone of contention between Harris and Griffith centers on whether they later agreed to change from a commission, independent contractor agreement to a salaried, employee agreement. In resolving this issue, the chancellor looked to what he determined to be the manner of payment and Harris’s continued employment after Griffith allegedly announced to Harris that Griffith would no longer pay the commission for sales procured. In other words, in his judgment, the chancellor found that Griffith terminated the commission agreement and that Harris acquiesced in a course of dealing that demonstrated that the agreement had been changed to one wherein he received $1,000 a week, by accepting the payment. As we have already noted, we do not find substantial evidence in the record to support the chancellor’s finding. We will not rediscuss our finding here.
 

 CONCLUSION
 

 ¶ 35. We find that there is not substantial evidence in the record to support the chancellor’s finding that there was a mutually agreed upon novation of the oral contract that Harris and Griffith had entered into, which required Griffith to pay Harris a ten percent commission on all sales procured by Hams. Our finding is based on the fact that the chancellor supported his finding of novation on the method of payment made between 1998 and 1999, as evidenced by the payments reflected on Griffith’s financial ledgers, and Harris’s acceptance of those payments. Despite the chancellor’s finding, a close examination of the referenced financial records do not reveal substantial evidence of a change in the method of payment. First, Griffith did not have any records reflecting the method of payment before January 1997, even though it is undisputed that the parties’ commission agreement began in either December 1993 or January 1994. As stated, Griffith produced no payment records for the period of time between January 1994 and December 1996. Further, Griffith testified that the commission-based agreement changed in 1995 or 1996 but that he did not believe it occurred before 1995. Therefore, based on the undisputed evidence, payments under the commission arrangement were made for at least one year. Yet, there were no payment records from Griffith for that year or any other year that the chancellor could use for comparison with the payment records for the 1998-1999 period of time utilized by the chancellor in arriving at his decision. Second, even the payment records for the 1998-1999 period do not divulge substantial evidence relevant to the question of whether the payments were being made to a salaried employee or an independent contractor. This is because the records do not reveal gross and net payments. Third, the payment records, as well as the testimony, reveal that Harris was not paid a salary of $1,000 per week after the period of time when he allegedly acquiesced in accepting such a payment arrangement. As already pointed out, Griffith at trial and his lawyer at oral argument admitted that during a period of
 
 *363
 
 time before Harris terminated his employment, Griffith only paid Harris $250 per week. Therefore, we reverse and render the chancellor’s finding of a novation of the commission based contract and remand this case to the chancellor for the purpose of determining the amount owed to Harris pursuant to the commission-based contract that the parties entered into.
 

 ¶ 36. THE JUDGMENT OF THE MARION COUNTY CHANCERY COURT IS REVERSED AND RENDERED AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
 

 KING, C.J., LEE AND MYERS, P.JJ., BARNES AND ISHEE, JJ., CONCUR. ROBERTS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, J., DISSENTS WITHO.UT SEPARATE WRITTEN OPINION. CARLTON, J., NOT PARTICIPATING.
 

 [1]
 

 . We quote these issues verbatim from Harris’s amended complaint that was filed on December 9, 2005.
 

 [2]
 

 . Actually, Lefoldt testified that the amount owed was $171,938.07 but that Harris gave Griffith a one hundred dollar per week credit, which totaled $27,300 ($5,200 per year for five and a quarter years). It is not clear in the record what this credit was for. However, during oral argument, Harris's attorney seemed to indicate that Harris offered this credit as a gesture of goodwill, apparently because the volume of the separate administrative work that Harris was performing for Griffith had been a bit low for the amount of salary being paid. In arriving at the $144,638.07 figure, Lefoldt used records supplied by both Harris and Griffith Water Well. However, he stated that he relied on the company's records for a determination of how much Harris had been paid. He testified that the documents that he reviewed are consistent with Harris's deposition testimony that Harris was an independent contractor, as the records show that the payments made to Harris were coded as sales expenses.
 

 [3]
 

 . During oral argument, Harris's attorney stated that his client was willing to forgive the $11,142.13 in earned but unbilled commissions. Therefore, the amount that Hams contends he is owed is $133,495.94, plus prejudgment interest in the amount of $56,597, for a total of $190,092.94.
 

 [4]
 

 . The contention is better stated that the chancellor erred in finding that there was a novation of the independent contractor sales contract, changing it to a salaried, employee at will agreement, because both parties agree that the initial sales agreement provided that Harris would be an independent contractor and receive a ten percent commission on all sales made.
 

 [5]
 

 . Even though Griffith testified that the agreement changed in either 1995 or 1996, we start by looking at records from September 1998 to determine whether the record supports the chancellor’s findings because this is the earliest period for which we can cross-reference checks issued to Harris that totaled approximately $1,000.